UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

NIKITA WORTH
1620 Madison Street, #2
Manitowoc, WI 54220

      Plaintiff,

      v.                                    Case No: 24-CV-0417

ALLIANCE LAUNDRY SYSTEMS LLC
221 Shepard Street
Ripon, WI 54971

      Defendant.

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, Nikita Worth, by her counsel, HEINS EMPLOYMENT LAW PRACTICE LLC, by Attorney Janet L. Heins, as and for a claim against the Defendant, alleges and shows to the court as follows:

### JURISDICTION & VENUE

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq., et al.,* and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*.

2. The events giving rise to Plaintiff's claims occurred within the Eastern District of Wisconsin, Green Bay Division, and venue is therefore proper in this District pursuant to 28 U.S.C § 1391(b), *inter alia.*

## THE PARTIES

3. The Plaintiff, Nikita Worth, is an adult resident of the State of Wisconsin, residing at 1620 Madison Street, #2, Manitowoc, WI 54220. She worked for Defendant at the Manitowoc location of Defendant Alliance Laundry Systems LLC.

4. Ms. Worth is a transgender woman with disabilities who began publicly identifying as female in or around 2019, prior to her employment with Defendant. She has been diagnosed with gender dysphoria. Gender dysphoria is classified as a medical condition under The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), which is a manual published by the American Psychiatric Association (APA) and widely used by mental health professionals in the United States.

5. Ms. Worth also suffers from Ehlers Danlos syndrome (EDS), which is a group of hereditary connective tissue disorders that manifests clinically with skin hyperelasticity, hypermobility of joints, atrophic scarring, and fragility of blood vessels. There are many different types of Ehlers Danlos syndrome, but the most common signs and symptoms include: (1) **Overly flexible joints.** Because the connective tissue that holds joints together is looser, your joints can move far past the normal range of motion. Joint pain and dislocations are common. (2) **Stretchy skin.** Weakened connective tissue allows your skin to stretch much more than usual. You may be able to pull a pinch of skin up away from your flesh, but it will snap right back into place when you let go. Your skin might also feel exceptionally soft and velvety. (3) **Fragile skin.** Damaged skin often doesn't heal well. For example, the stitches used to close a wound often will tear out and leave a gaping scar. These scars may look thin and crinkly.

6. The Defendant, Alliance Laundry Systems LLC ("Alliance"), at all times material herein, was a foreign corporation doing business in the State of Wisconsin, with a principal office

located at 100 Manpower Place, Milwaukee Wisconsin 53212, and a branch located at 100 City Center, Suite F, Oshkosh, WI 54901, for which Plaintiff worked at all times material herein.

7. Defendant is a covered employer under Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*.

## THE FACTS

8. Plaintiff began working for Defendant in January 2022 as a General Parts team member for the Manitowoc, Wisconsin, location of Defendant.

9. In her first hour at Defendant on her first day of employment, Plaintiff was told that she could not use the women's restroom. Plaintiff told Alliance's Benefits and Payroll Manager, Sarah Drews, that this directive was illegal. Drews did not respond.

10. Ms. Worth availed herself of the self-insured health insurance coverage provided by Alliance and administered by the Union at all times during her employment.

11. In February 2022, Ms. Worth requested insurance coverage for gender affirming surgeries: facial feminization surgery and genital surgery.

12. Ms. Worth scheduled her gender affirming surgical procedures for May 31, 2022.

13. On March 16, 2022, Ms. Worth was denied coverage for her gender affirming facial feminization procedure as Defendant considers gender affirming facial feminization surgery a "cosmetic treatment" that is "not medically necessary" and is thus not a covered surgical treatment under its health insurance plan. the terms of the policy itself are discriminatory. Defendant's policy classifies as "cosmetic" procedures those that were prescribed by and recommended by Ms. Worth's physician pursuant to her diagnosis of gender dysphoria.

14. However, Defendant's insurance plan covers a wide range of other treatment

options for a diagnosis of "gender dysphoria," including behavioral therapy, psychotherapy, hormone therapy, and surgery for gender transformation:

   a. The plan covers surgical treatment for gender dysphoria, breast surgery and genital surgery, where individuals provide documentation in the form of a written psychological assessment from a Qualified Behavioral Health Provider that the individual meets all criteria for surgical treatment.

   b. The plan covers a broad range of surgeries for transgender male patients, including breast augmentation such as bilateral mastectomy or reduction, hysterectomy (removal of uterus), laser or electrolysis hair removal in advance of genital reconstruction, metoidioplasty and phalloplesty (creation of penis), penile prosthesis, scrotoplasty (creation of scrotum), salpingo· oophorectomy (removal of fallopian tubes and ovaries), testicular prosthesis, urethroplasty (reconstruction of male urethra), vaginectomy (removal of vagina), and vulvectomy (removal of vulva).

   c. The plan covers only select surgeries for transgender female patients, including clitoroplasty (creation of clitoris), labiaplasty (creation of labia}, laser or electrolysis hair removal in advance of genital reconstruction, orchiectomy (removal of testicles}, penectomy (removal of penis), urethroplasty (reconstruction of female urethra), and vaginoplasty (creation of vagina)-but excludes coverage for scrotectomy (removal of excess scrotal tissue).

   d. Under the Defendant's plan, a broad range of gender affirming surgeries are held as "ancillary procedures" considered to be "cosmetic and not medically necessary when performed as part of surgical treatment for gender dysphoria."

e. The noncovered gender affirming surgeries under the plan include abdominoplasty, blepharoplasty, body contouring (i.e., fat transfer, lipoplasty, panniculectomy), breast enlargement including mammaplasty augmentation and breast implants, brow lift, calf implants, cheek/chin/nose implants, face/forehead lift and/or neck tightening, facial bone remodeling for facial feminization, hair transplantation, injection of fillers or neurotoxins, laser or electrolysis hair removal not related to genital reconstruction, lip augmentation, lip reduction, liposuction, mastoplexy, pectoral implants fur chest masculinization, rhinoplasty, skin resurfacing, thyroid cartilage reduction/reduction thyroid chrondroplasty/trachea shave (removal or reduction of the Adam's apple), voice modification surgery (i.e., laryngoplasty, glottoplasty, or shortening of the vocal cords), voice lessons and voice therapy.

15. On March 25, 2022, Ms. Worth timely appealed the denial of her gender affirming facial feminization surgery.

16. As a result of the exclusion, Ms. Worth had to cancel her planned gender affirming facial feminization surgery with Dr. Catharine B. Garland, a plastic and reconstructive surgeon, originally scheduled for May 31, 2022.

17. On April 19, 2022, Alliance, through United Healthcare, denied Ms. Worth her requested coverage for genital gender affirmation surgery, determining that the "service is not medically necessary," thus not covered under the plan, due to a finding that "[t]here is no recent confirmation that you being treated with hormone therapy," and "[o]ne of your providers did not date their consultation note."

18. Ms. Worth timely appealed the April 19, 2022 denial.

19. On April 21, 2022, Ms. Worth was again denied coverage of her genital gender

affirming surgery.

20. Defendant, in a lengthy response submitted to EEOC on Plaintiff's charge of discrimination, stated, "On or about May 9, 2022, Ms. Worth contacted ALS's Human Resources department and expressed that she was denied coverage for certain services and believed she was being discriminated against due to the denial."

21. Ms. Worth contacted Alliance's Benefits and Payroll Manager, Sarah Drews, about the discriminatory exclusions. She asked Alliance to change the terms of its health insurance coverage to bring it in line with federal and state anti-discrimination policies.

22. Ms. Drews responded that Alliance is self-insured and was not required to change its policies. She confirmed that Alliance would not change the exclusions.

23. Ms. Worth also contacted her Union Representatives at United Steel Workers 1327 about her health insurance claim denial and the discriminatory exclusions. She asked her Union to negotiate with Alliance, per the plan's terms, to require Alliance to change the terms of its health insurance coverage to bring it in line with federal and state.anti-discrimination policies.

24. The Union responded that Alliance is self-insured and was not required to change its policies on "cosmetic procedures" related to diagnosis of gender dysphoria. The Union confirmed that Alliance would not change the exclusions.

25. In early June 2022, Ms. Worth again reached out to her Union about the health insurance claim denial and discriminatory exclusions, this time speaking to Rose Trombley.

26. Ms. Trombley reiterated that facial feminization surgery is considered "cosmetic" under the Plan and thus is not covered.

27. Ms. Worth responded that she could pursue a breach of contract claim against the Union for not discussing changes to local. state, or federal laws that may or may not requite

modification to the plan provisions.

28. Following that conversation, the Union filed a grievance against Alliance on behalf of Ms. Worth.

29. As a result of that grievance, Defendant still refused to allow Ms. Worth's requested care but offered other procedures she had not requested if she withdrew her grievance. She refused, but the Union dropped the grievance.

30. Plaintiff never received her requested gender-affirming care procedures and has suffered great emotional distress at being stalled in her gender transition by the unlawful discrimination by Defendant.

31. The seventh version of the World Professional Association for Transgender Health (WPATH) Standards of Care (SOC) does acknowledge that facial feminization surgery (FFS) can be a necessary and effective treatment for gender dysphoria in some transgender individuals. See Section VI of the WPATH SOC version 7, which is titled "Hormone and Surgical Therapy for Gender Dysphoria." In this section, the WPATH SOC notes that FFS may be indicated for some transgender women who experience distress related to facial features that are incongruent with their gender identity. The WPATH SOC also notes that FFS should be considered in the context of a comprehensive gender-affirming treatment plan that includes appropriate mental health support before and after surgery.

32. On March 7, 2023, Plaintiff asked for accommodations relating to her disabilities and provided a doctor's note to Defendant, stating, "Nikita Worth is unable to participate in daily stretching programs and exercise programs due to ongoing care for musculoskeletal issues caused [by] E.D.S. She does participate in a structured exercise program in correlation with pain management and other providers."

33. When Defendant refused to offer her any accommodations, it put her on unpaid leave through FMLA.

34. On April 10, 2023, Plaintiff brought to Defendant a doctor's note with job restrictions that she asked Emily Ward at Alliance to accommodate. The doctor's note, dated April 7, 2023, specified that Ms. Worth "has been examined by a healthcare professional and may return to work with the following restrictions: No excessive squatting or heavy lifting over 5 pounds, no excessive sitting for long periods of time on hard surfaces."

35. Defendant simply denied Plaintiff's request for reasonable accommodations and sent her home from work without pay on April 10, 2023.

36. Defendant refused and failed to engage in the interactive process with Ms. Worth regarding her accommodations request.

37. On April 19, 2023, Plaintiff continued to argue that the requested accommodations were reasonable and requested that Defendant allow her to return to work.

38. On April 26, 2023 and on other occasions, Plaintiff emailed Defendant regarding disability law and how it should be applied to her in her request for reasonable accommodations and how her restrictions should be easy to accommodate. Defendant refused.

39. On May 1, 2023, Plaintiff emailed Defendant with a very specific definition of her disability and explained how her EDS affected her ability to do the tasks that her doctor had excused her from.

40. On May 11, 2023, Plaintiff submitted to Defendant a note from her doctor, lifting all her medical restrictions.

41. On May 12, 2023, Defendant allowed Ms. Worth to return to work because she had no more medical restrictions.

42. On June 7, 2023, Defendant and the Union met with Ms. Worth to explain new job requirements of cross-training within her work group. Plaintiff knew that she would need accommodations to meet those requirements and the company threatened insubordination and forced her hand to expose her medical condition to people who did not need to know about it, as she noted in a June 29, 2023 email to Defendant.

43. Plaintiff, also in the June 29, 2023 email to Defendant, pointed out, "you have my condition on file, but you refuse to go through the interactive process of communication between me and the reasons as to why I cannot cross train in specific areas. Like I stated a long time ago, you refused to listen. Part of the reasonable accommodation aspect of being made is communication between the employee and how they're affected by the condition. What you're doing is nothing … short of retaliation. I may be filing more complaints against this company for retaliation in this specific situation if this does not … stop."

44. On August 2, 2023, Defendant gathered all the union members and nonunion coworkers together for a meeting discussing their jobs and announced that next week Wednesday they would be eliminating cross training.

45. Defendant kept changing jobs around and refusing to grant her accommodations. It also kept demanding medical information not necessary to determine accommodations.

46. Plaintiff was on unemployment for almost a month when Alliance refused to make reasonable accommodations for her.

47. On October 5, 2023, Defendant emailed Ms. Worth to say they would be requiring an "independent" medical examination of her regarding her request for reasonable accommodations.

48. On October 6, 2023, Plaintiff was finally able to see her pain doctor, who gave her

the following medical restrictions: "Lifting—no excessive lifting over 10 pounds when bending, twisting, squatting, reaching, pulling, pushing. Please allow to sit down as needed. Please allow to wear medical alert bracelet."

49. On October 25, 2023, Ward emailed Plaintiff, stating, "I've verified and we can continue to accommodate this within your Kitting position," referring to her October 6, 2023 doctor's note with work restrictions.

50. In mid-December 2023, Plaintiff's coworker harassed her about transgender issues and told her that her requested surgery was merely cosmetic, and that her transition was "a want, not a need." They argued about it and other employees came to Plaintiff's defense. Plaintiff reported this incident to Defendant's Human Resources but they took no action.

51. On January 18, 2024, Plaintiff sent Ward another email requesting reasonable accommodations for her disabilities.

52. Because Defendant refused to reasonably accommodate Plaintiff's disabilities, including allowing her to sit and work, Plaintiff was forced to either go home early or sit on the toilet when the pain became too much to bear.

53. Then Defendant seized on Plaintiff's religious jewelry that she always wore and decided it violated some policy of Defendant.

54. Defendant continued to press Plaintiff to modify her jewelry, but Plaintiff was already in compliance with the policy.

55. While this was happening, Plaintiff worked at a table putting small items in bags and was not around any heavy machinery that even might pose a safety risk.

56. On Friday, February 2, 2024, Defendant sent Plaintiff home from work without pay for refusing to remove her jewelry, as a pretext for discrimination and retaliation against her.

57. On Saturday, February 3, 2024, when Plaintiff returned to work, Defendant had police escort her from the property and did not allow her to work.

58. On February 4, 2024, in responding to admonishments from Defendant's HR, Plaintiff wrote:

> All you and the company do is threaten me continuously. The reason you had me leave the property enforced me to leave the property was because of my religious believes. Again the company violates various laws and will be held accountable. What you're doing is retaliatory. Discrimination after discrimination after discrimination and retaliation, after retaliation in various patterns, mixed with the discrimination. You refused to make religious accommodations [for] me. Yet the company makes them for others. Just further discrimination and retaliation against me when all I am trying to do in life is heal and live my life. Couldn't get my employee file, right. You Disregarded ADA accommodations. Had me on unemployment when you refused to make accommodations from a complication that I had from surgery. Still refused to make accommodations for me for medical. Discrimination in my healthcare, in trans care. Couldn't even put forward my FMLA leave when I requested it.

59. On or about August 22, 2022, Plaintiff filed an administrative complaint of sex discrimination against Defendant with the Wisconsin Equal Rights Division, ERD Case No. CR202202402, cross-filed with the Equal Employment Opportunity Commission as EEOC Case No. 443202203029. The EEOC issued its Notice of Right to Sue on this charge on January 8, 2024.

60. On or about July 29, 2024, Plaintiff filed an administrative complaint of religious discrimination, disability discrimination, and retaliation against Defendant with the Wisconsin Equal Rights Division, which was cross-filed with the Equal Employment Opportunity Commission. Plaintiff has requested a Notice of Right to Sue on this charge as well.

61. Plaintiff filed for unemployment compensation after being escorted by police out of Defendant's workplace. Her claim was initially denied but her appeal overturned the denial of benefits.

62. Plaintiff's Union filed a grievance over her suspension pending termination, but it was denied by Defendant.

63. Defendant terminated Plaintiff's employment effective May 18, 2024.

64. Plaintiff has exhausted her administrative remedies and satisfied all conditions precedent to this action.

**FIRST CLAIM FOR RELIEF – TITLE VII SEX DISCRIMINATION**

65. Plaintiff realleges and incorporates paragraphs 1- 64 of this complaint by reference.

66. Defendant intentionally discriminated against Plaintiff on the basis of her sex in the terms and conditions of her employment in denying her necessary medical treatment that was provided to male employees, and by terminating her employment, in intentional disregard of her federally protected rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

67. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of loss of wages and other employment benefits, pain and suffering, emotional distress, prejudgment and post-judgment interest, attorney fees and costs, punitive damages, and other damages proved at trial.

**SECOND CLAIM FOR RELIEF—TITLE VII RELIGIOUS DISCRIMINATION**

68. Plaintiff realleges and incorporates paragraphs 1- 67 of this complaint by reference.

69. Defendant intentionally discriminated against Plaintiff on the basis of her religion in the terms and conditions of her employment and by terminating her employment, in intentional disregard of her federally protected rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

70. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of loss of wages and other employment benefits, pain and suffering, emotional

distress, prejudgment and post-judgment interest, attorney fees and costs, punitive damages, and other damages proved at trial.

### THIRD CLAIM FOR RELIEF—TITLE VII RETALIATION IN TERMINATION

71. Plaintiff realleges and incorporates paragraphs 1- 70 of this complaint by reference.

72. Defendant intentionally discriminated against Plaintiff on the basis of her religion and/or sex by terminating her employment, in intentional disregard of her federally protected rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

73. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of loss of wages and other employment benefits, pain and suffering, emotional distress, prejudgment and post-judgment interest, attorney fees and costs, punitive damages, and other damages proved at trial.

### FOURTH CLAIM FOR RELIEF—ADA DISABILITY DISCRIMINATION

74. Plaintiff realleges and incorporates paragraphs 1- 73 of this complaint by reference.

75. Defendant intentionally discriminated against Plaintiff on the basis of her disabilities in the terms and conditions of her employment in denying her necessary medical treatment based upon her disabilities in intentional disregard of her federally protected rights under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*.

76. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of loss of wages and other employment benefits, pain and suffering, emotional distress, prejudgment and post-judgment interest, attorney fees and costs, punitive damages, and other damages proved at trial.

### FIFTH CLAIM FOR RELIEF—ADA RETALIATION IN TERMINATION

77. Plaintiff realleges and incorporates paragraphs 1- 76 of this complaint by reference.

78. Defendant intentionally retaliated against Plaintiff on the basis of her disabilities in terminating her employment based upon her disabilities and in retaliation for complaining of disability discrimination, in intentional disregard of her federally protected rights under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*.

79. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of loss of wages and other employment benefits, pain and suffering, emotional distress, prejudgment and post-judgment interest, attorney fees and costs, punitive damages, and other damages proved at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendants to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff her attorney fees, costs and disbursements as provided by 42 U.S.C. § 12117, *inter alia*, and all other applicable statutes and provisions; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable.

Dated this 29th day of July, 2024.

HEINS EMPLOYMENT LAW PRACTICE LLC
Counsel for the Plaintiff

*s/ Janet L. Heins* .
Janet L. Heins, WI Bar No. 1000677

HEINS EMPLOYMENT LAW PRACTICE LLC
200 South Executive Drive, Suite 101
Brookfield, WI  53005
(262) 241-8444 voice
e-mail: jheins@heinslawoffice.com